IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 21-CR-160-4 (TJK) |
| v. | : | 18 U.S.C. §§ 231(a)(3), 2 |
| CORY KONOLD, | : | |
| Defendant. | : | |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Cory Konold, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday,

November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed, among other things, the U.S. Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5. Shortly before 1:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted

those acts. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.8 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8. On the morning of January 6, the defendant and co-defendant Felicia Konold made contact with a group of men that included co-defendants William Chrestman, Christopher Kuehne, Luis Enrique Colon, and Ryan Ashlock, all of whom were members of the Proud Boys from the Kansas City area. The Proud Boys described itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud

Boys members routinely attended rallies, protests, and other events, some of which resulted in violence involving members of the group.

9. After joining with the Kansas City Proud Boys, the defendant and Felicia Konold followed the men to the National Mall, where they joined with a larger group of Proud Boys members and associates from around the country. The defendant then followed the large Proud Boys group as it marched across the National Mall and in the streets near the U.S. Capitol while shouting, among other things, "Whose streets? Our streets!" The defendant and the group ultimately made their way to the west side of the Capitol's grounds, outside of the restricted, fenced-off perimeter made up of barricades guarded by uniformed USCP officers. At that location, the defendant, the Proud Boys group, and other individuals gathered outside the barricades and chanted phrases including "Whose Capitol? Our Capitol!"

10. Shortly before 1:00 p.m., members of the crowd breached the line of barriers and surged toward the Capitol building. The force of the crowd's combined numbers caused the USCP officers stationed at the barricades to run for safety. Just as the first police line was being overwhelmed, the defendant — along with co-defendants Chrestman and Felicia Konold — made his way to the front of the crowd and became one of the first rioters to trample over the toppled barricades. Along with other members of the crowd, the defendant then made his way with Chrestman and Felicia Konold past multiple subsequent lines of barricades and onto the Capitol's Lower West Plaza, inside the restricted area.

11. For more than one hour, the defendant remained on the west front of the Capitol. Throughout that time, USCP officers (eventually joined by D.C. Metropolitan Police Department officers) tried unsuccessfully to control the crowd and expel it from the restricted area by, among other things, giving verbal orders to disperse, forming police lines, and deploying crowd-control

measures including less-lethal munitions. Notwithstanding these police actions, the defendant failed to leave the area. Instead, the defendant remained unlawfully on the restricted Capitol grounds, staying in close proximity to Chrestman, who made various efforts to instigate the crowd and oppose police efforts to quell the riot. At one point, seeing officers attempting to arrest an unruly rioter, Chrestman yelled, "Don't let them take him!" At another point, with assistance from co-defendant Felicia Konold, the defendant put on a helmet that would help him to withstand the crowd control measures police were employing.

12.     Near the base of the inaugural scaffolding, the defendant and other members of the crowd came up against another line of police attempting to hold a line of barricades. Members of the crowd were trying to break through the line by force. The defendant, along with co-defendants Chrestman and Felicia Konold, joined in this effort, using the force of their bodies to try to push back the barriers and officers.

13.     Eventually, the defendant reached the base of the Capitol building and made his way onto the Upper West Terrace. By then, members of the crowd had forcibly breached the building by breaking windows next to the Senate Wing Door, climbing through the windowpanes, and opening the door from the inside. Numerous members of the crowd began funneling into the building, including the defendant, who entered through the doorway at approximately 2:25 p.m., roughly twelve minutes after the initial breach.

14.     Once inside, the defendant and others, including co-defendants Chrestman, Kuehne, Colon, and Felicia Konold, moved about the building and made their way to the Crypt. Several USCP officers in that area, badly outnumbered by members of the crowd, began running away and positioned themselves on the opposite side of a large, sliding-door style metal barrier that was being lowered from overhead. Members of the crowd pursued the officers and

successfully stopped the door from closing by placing chairs and a trash can in its path. Within view of the defendant, who was several feet away, police attempted to close the door and repel the rioters, who were throwing objects and spraying chemical irritants at police. Ultimately the rioters prevailed, and the officers retreated further into the building.

15. After others successfully prevented police from closing the barrier, the defendant and others progressed into the Capitol Visitor Center. After a short time there, the defendant returned to the Senate Wing Door and left the building.

16. While inside the building, the defendant took possession of a USCP riot helmet. He brought the helmet home with him, and a family member later voluntarily turned it over to law enforcement, at the defendant's direction.

*Elements of the Offense*

17. The parties agree that Obstruction of Law Enforcement During Civil Disorder, in violation of Title 18 U.S.C. §§ 231(a)(3), requires the following elements:

   a. That the defendant knowingly committed an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

   b. That, at the time of the defendant's act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder, as that term is defined at 18 U.S.C. § 232(1), that is, "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

   c. That the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the conduct or performance of any federally protected function as that term is defined at 18 U.S.C. § 232(3), that is, "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof."

*Defendant's Acknowledgments*

18. The defendant knowingly and voluntarily admits to all the elements as set forth above.

                                 Respectfully submitted,

                                 MATTHEW M. GRAVES
                               United States Attorney
                               D.C. Bar No. 481052

By:    *s/ Conor Mulroe*
        CONOR MULROE
        Trial Attorney
        U.S. Department of Justice,
          Criminal Division
        1301 New York Ave. NW
        Washington, D.C. 20530
        (202) 330-1788
        Conor.Mulroe@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Cory Konold, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 09/14/2023                    *CoryKonold*
                                    Cory Konold
                                    Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 9/18/2023                     *Nicholas Smith*
                                    Nicholas D. Smith
                                    Attorney for Defendant